**BRYAN & EMERY, Inc., v. FRICK–REID SUPPLY CO. (No. 3098.)**

Court of Civil Appeals of Texas. Amarillo. Nov. 7, 1928.

and owing upon certain oil well casing and material sold to said Pattison and by said Pattison sold to Bryan & Emery, Inc., and which last-named defendant is alleged to have converted said pipe and material to its own use and benefit. J. F. Dye filed his petition of intervention in the cause, claiming said pipe and material by reason of purchase thereof as an innocent purchaser. Upon trial before a jury and on the verdict of the jury, the court rendered judgment for the plaintiff against the defendants, Bryan & Emery, Inc., and Pattison, and in favor of intervener, Dye, and against the plaintiff on intervener's plea of innocent purchase. The defendant Bryan & Emery, Inc., has appealed from said judgment to this court.

In its first amended original petition, plaintiff alleges that it is a foreign corporation with a permit to do business in the state of Texas; that on October 30, 1926, the plaintiff and defendant Pattison entered into a verbal contract, by the terms of which contract plaintiff agreed to sell to said defendant Pattison, upon credit, the casing and material necessary for the drilling of a well for Pattison, which he was about to commence in King county, Tex., said casing to be delivered to defendant Pattison as he called for it; further alleging that defendant Pattison agreed to pay for same within 60 days after delivery thereof; that, in pursuance of said contract, the plaintiff delivered to Pattison, for the purpose aforesaid, the casing and supplies thereinafter set out, specifically showing the items of casing and supply and the dates of the sales and delivery thereof, the amount said defendant agreed to pay plaintiff therefor aggregating the sum of $24,422.87; that, after the plaintiff had delivered the casing and material above set out, Pattison executed and delivered to the plaintiff his two certain promissory notes in the sums, respectively, of $11,825.16 and $12,597.71, the aggregate of the two being the sum of $24,422.87; and also alleging that said notes evidenced the debt due the plaintiff for the purchase price of the above-described merchandise; that said notes were taken by the plaintiff as an extension of the time of payment of said debt and upon agreement of said Pattison that he would execute and deliver to the plaintiff a chattel mortgage upon all of said property to secure the payment of said debt, but that said defendant failed to execute and deliver said chattel mortgage, yet at all times he had agreed to execute same; that, when said notes became due, payment of the debt was extended by the defendant executing and delivering to the plaintiff renewal notes and describing such renewal notes; that defendant Pattison has failed and refused to execute and deliver said mortgage to the plaintiff, and that plaintiff is now entitled to the possession of said property

G. C. Spillers, of Tulsa, Okl., Wm. B. Combest, of Paducah, and Carrigan, Britain, Morgan & King, of Amarillo, for appellant.

Bell & Bell, of Paducah, and Fischer & Fischer, of Wichita Falls, for appellee.

RANDOLPH, J. Appellee, as plaintiff, brought this suit against the appellant and J. C. Pattison, as defendants, to recover the sum of $9,707.20, balance alleged to be due

and to foreclose its lien thereon; alleging that, within three months after the delivery of said merchandise by the plaintiff to Pattison, Pattison executed and delivered to the defendant Bryan & Emery, Inc., a bill of sale to all of said property; that said sale was not made in good faith for a valuable consideration and in the absence of knowledge of plaintiff's lien thereon, but was only a simulated sale and an attempt on the part of said Pattison and said Bryan & Emery, Inc., acting in concert and collusion, to make it appear that said property had been sold to a third person for a valuable consideration who was innocent of plaintiff's lien thereon. Plaintiff further alleges that said Bryan & Emery, Inc., did not pay Pattison anything more than a nominal consideration for said property, and therefore it is not a bona fide purchase of same without notice of plaintiff's lien thereon; alleging that defendant Bryan & Emery, Inc., had full knowledge of all the terms of the trade, and that such knowledge, independent of any actual knowledge, was sufficient to put said defendant upon inquiry as to whether the purchase price had been paid, and they were therefore charged with notice that plaintiff had a lien on same by virtue of the Constitution of the state of Texas. Plaintiff further alleges the claim of intervener as an innocent purchaser, and pleads, in the alternative, that, if intervener should be held to be an innocent purchaser of said property, then that Bryan & Emery, Inc., had sold and converted certain portions of said property, setting out the various items alleged to have been converted, aggregating in value $9,707.20.

Plaintiff then prays for judgment against defendants Pattison and Bryan & Emery, Inc., for the last-named sum, for the recovery of the first-described property, which has not been disposed of, and for general relief.

The defendant Bryan & Emery, Inc., filed its answer, consisting of a general exception, special exceptions, general denial, and special defenses not necessary to be set out here. Plaintiff then filed reply pleadings which are not necessary to be set out here.

The appellant, Bryan & Emery, Inc., under its first proposition, urges as error on the part of the trial court the refusing by that court to set aside the findings of the jury in answer to special issue No. 1, which is alleged to be erroneous for the reason that there was no evidence adduced on the trial of this cause that sustains the affirmative finding of the jury, wherein they found that Bryan & Emery, Inc., at the time it purchased the material in question, had notice that Pattison had not paid the appellee the purchase price of same. Issue No. 1, referred to, is as follows:

"At the time the defendant Bryan & Emery, Inc., took the bill of sale from the defendant J. L. Pattison, for the oil well casing and material in controversy, did any of its officers have any notice that the defendant Pattison had not paid the Frick-Reid Supply Co., the purchase price of same? Answer Yes or No"—which the jury answered "Yes."

The question whether or not there was any evidence to sustain the jury's finding in answer to said issue is disposed of by a consideration of the recitals of the statement of facts as follows: Defendant Pattison first testified that, in the trade he made with Bryan & Emery, Inc., that company was to pay the debts down in King county outstanding against him, for the purpose of keeping liens off the property; that he never said anything to them about paying Frick-Reid Supply Company for the pipes and material; that they did not know that he got the casing from the Frick-Reid Supply Company and they did not know it had not been paid for; that they did not ask him anything about the pipe and material and did not ask him where he got it. Quoting from him:

"I simply told them I had made settlement for the pipe with my note. They did not ask me who I gave the note to. I just told them I had made settlement for it by note. * * *"

E. D. Johnson, credit manager for the Frick-Reid Supply Company, testified that Pattison told him that he had made an agreement with Bryan & Emery, Inc., to complete the well, but did not tell him what the agreement was, and he went to Bryan & Emery, Inc.'s, office and talked with Mr. Bryan, its president. Mr. Johnson further testified as follows:

"I said to him what kind of a deal have you got with Mr. Pattison and he replied that Mr. Pattison gave them a bill of sale and I said 'a bill of sale?' and he says 'yes,' and I says 'to what?' and he says 'to the pipe down there' and I said 'well, I am going to start suit right away to get our pipe'—Our conversation about the pipe was, 'I said you knew he had never paid us for that pipe, and knew that we had a lien on that pipe' and I says, 'What are you going to do about it?' and he said 'You hadn't filed any lien' and I said 'Well, I will start suit right away, you knew that pipe belonged to us', and he said 'there is no use of you and I quarrelling about this, we are going to finish the well, and there is enough money—purchase orders, to take care of the drilling of the same,' so I—and in the conversation, he told me he had a bill of sale for the pipe, that was to guarantee him against any additional cost of drilling the well—the consideration was that. He said there was sufficient purchase orders to finish the well, and would be some left over. He further stated, if we get a well, we will pay for the pipe, and if we don't, we will pull the pipe, and you will get the pipe back. When I stated to him that Mr. Pattison had not paid us for the pipe, and that we had a lien on it, he stated that we would get the pipe back. I do not recall just the exact words he used, but that effect. When I went over there to investigate and find out what sort of deal he had with Mr. Pattison, he showed me the bill of sale, and made the statements I have

just detailed, and I told him in that conversation that he knew that the pipe had not been paid for, and it came from us, and he stated that we had not filed any lien on it, and stated that he had one. I told him then that we had a lien on it. The conversation in reference to the pipe was that if they got a well they would pay for the pipe, but if not, we would get the casing back. In that conversation Mr. Bryan told me he understood that Mr. Pattison had not paid for the casing. In reference to the use of the pipe down there, he said 'Mr. Johnson, there is no use of you and me quarrelling about this; we have an agreement to finish the well, and there is enough purchase orders to pay for the drilling of the well' and he said 'after we drill the well, and if a duster, we will give you back your pipe.' I believed the statement he made to me then. The next time I talked with Mr. Bryan about this matter, I believe was along in January of this year, and at that time he said they had spent about $7,000.00 more than they thought on this drilling contract, and wanted me to pay them $7,000.00 in cash—that they had spent that much more than they thought, and if we paid that amount in cash, they would give us back the pipe, since they had spent $7,000.00 more than the purchase orders they had. He said if we would pay that, they would turn the pipe back to us, and after that conversation, I immediately went down and turned the papers over to you (Judge Fischer) for suit."

Clearly, this evidence supports the finding of the jury that Bryan & Emery, Inc., had notice that the purchase price had not been paid when they took the pipe in their trade with Pattison. Appellant contends that, when Bryan stated that he "understood" the pipe had not been paid for, he meant to say that he so understood at the time he was talking with Johnson. We cannot so interpret the evidence, and the jury had a right to give it the interpretation they did. Therefore, there being evidence to support the verdict, it must be sustained. Underwood v. Security Life & Annuity Co., 108 Tex. 381, 194 S. W. 585.

■ We cannot concede that the giving of the notes was a payment of the debt. The notes were not the debt, but were only the evidence thereof.

"Where a debt exists and a note is given therefor by the debtor, the right of action is suspended upon the original consideration until the note becomes due and if it is unpaid at that time, the creditor may elect to sue upon the original indebtedness or upon the note, unless the" notes were "accepted as payment of the pre-existing debt." Otto v. Halff & Bro., 89 Tex. 384, 34 S. W. 910, 59 Am. St. Rep. 56.

But the taking of a note for a debt does not mean a payment of the debt unless it was so expressed or appears to have been so intended. Pope v. Graham & Co., 44 Tex. 196; Johnson v. Amarillo Implement Co., 88 Tex. 509, 31 S. W. 503. In the case at bar, it appears only that the notes taken were taken as evidence of the debt in its extension.

■ For that reason, the giving of the notes and the acceptance of them by plaintiff was not a waiver of the constitutional lien, and further, there being no pleadings furnishing proof of waiver, we cannot consider the giving of the notes as constituting a waiver of such lien. Waiver, in order to be a defense, must be specifically pleaded. Shelton v. Lemmon (Tex. Civ. App.) 268 S. W. 177, 178.

■ We cannot consider the plaintiff's original petition and the matters therein pleaded as a waiver of the constitutional lien for another reason. Where an amended petition is filed and substituted for an original petition, the original petition passes out of the case. Johnson v. Mooney (Tex. Civ. App.) 241 S. W. 308. The original petition in this cause is not therefore properly in the transcript, and the clerk should not have included it there. Nor was the original petition offered in evidence; hence, both for lack of pleading and further the fact that it was not introduced in evidence, we cannot consider it in order to sustain defendant's contention of waiver of constitutional lien by the plaintiff.

■ The trial court submitted to the jury special issue No. 2, with instructions that they should not answer it if they answered special issue No. 1 in the affirmative. Issue No. 2 submitted to the jury the question whether or not Bryan & Emery, Inc., at the time it purchased the casing and material in controversy, had knowledge of such fact as would have put an ordinarily prudent man upon inquiry to ascertain whether or not Pattison had paid the purchase price of the property in controversy. The trial court then submitted special issue No. 3, which was to be answered only in the event the jury answered issue No. 2 in the affirmative, which issue No. 3 required of the jury to find whether or not appellant could have ascertained if the purchase price of the property in controversy had not been paid. The appellant insists that the jury's answer, wherein they answered issue No. 3 in the affirmative, is without materiality or effect because there was no duty on the part of Bryan & Emery Inc., to exercise any diligence to ascertain whether or not the purchase price of the property had been paid unless they had knowledge of such facts as would put ordinarily prudent men upon inquiry. The court instructed the jury that they need not answer issue No. 2 unless issue No. 1 was answered in the negative. Their answer to issue No. 1 was in the affirmative, and therefore they did not answer issue No. 2. The jury were then instructed as to issue No. 3 that they should only answer No. 3 in the event they had answered No. 2 in the affirmative. Hence the jury's answer, not being called for, became immaterial. Again, the jury having in their answer to issue No. 1, found as a fact that, at the time they took the bill of sale from defendant Pattison, the officers of

Bryan & Emery, Inc., had notice that the defendant Pattison had not paid the purchase price for the property, such inquiry, if properly answered, became immaterial.

The appellant further contends that the trial court erred in the matter of submitting to the jury the reasonable market value of the casing and material in King county, Tex., for the reason that the evidence failed to disclose or fix the market value of such property at the time and place of the sale made by appellant to Dye and in failing in said special issue to define the term "reasonable market value."

The trial court submitted issue No. 4 as follows:

"If you have answered Special Issue No. 1 'Yes,' or Special Issues Nos. 2 and 3 'Yes,' then state what was the reasonable market value of the casing and material in controversy on February 18, 1928, at its location in King County, Texas? Answer in dollars and cents." To this the jury answered "$10,000.00."

■ The bill of sale from Bryan & Emery, Inc., to Dye was dated February 18, 1928, as shown by the testimony of intervener taken in connection with the date of the check given by him to Bryan & Emery, Inc. Consequently, if there was a conversion of the material and casing by Bryan & Emery, Inc., it occurred at the time of the sale to Dye, as evidenced by such check and evidence of the giving of a bill of sale on that date.

■ The witness Johnson, credit manager of appellee, testified:

"The original purchase price of that pipe was around $24,000.00. After the pipe had been run in a well located in King County, Texas, and pulled out, I judge it would be worth 50% of its original value, that is 50% of the cost of new pipe, so this would make an entire string, after having been run in a well and pulled out, average 50¢ on the dollar, and I would say that this string of pipe would be reasonably worth $12,000.00. I am not very well acquainted with the material end of the business and cannot state as definitely as some of our men in that branch of service as to its value at its location down there in King County, and I could not state it."

O. B. Albritton, an employee of appellee, testified:

"I think there has been a reduction in the value of pipe situated in King County, Texas, some twenty miles from a railroad. I would say that the price of pipe after it had been run in a well, the market price would be about 50% of the price of new pipe—that is, 50% off the list of new pipe. * * *

"I think there has been a reduction in the price of pipe since October, 1926. I can't give you the exact figure, but this discount went into effect some six or eight months ago, or a little more. I don't remember the exact date either. There was a drop of 10 and 2-1/2 out of stock and 10 and 5 on direct shipments. That was since this pipe was sold to Mr. Pattison in 1926. My testimony is that it would be worth 50% of the list price at the time it was taken out of the well, and not 50% at the time of sale. There was a drop of 10 and 2-1/2 per cent out of stock and 10 and 5 per cent on direct factory shipments, so a drop of 10 and 5% would be a considerable drop off the price of the pipe if it cost originally $24,000.00. It would reduce the price to approximately $20,000.00, so when I said 50% of the new price I meant 50% of the cost of new pipe on the basis of the market prevailing at the time for second pipe, so, in this case, if the cost of the pipe then had been, taking into consideration the drop in prices, $20,000.00, the price would be 50% of that, instead of $24,000.00, the original cost at the location. I never saw this pipe in question. To determine the cost of a string of second-hand casing, it should be seen."

Dye testified he paid Bryan & Emery, Inc., approximately $9,606.93 for the pipes and material sold him.

Taking this testimony at its face value, and, in connection with the whole of the statement of facts, it is clear that the evidence intended to relate to the time of the sale to Dye in King county, Tex. The testimony presented to the jury was an arithmetical proposition which they were entitled to work out, and was sufficient upon which to base their verdict.

■ The evidence in the case fails to disclose a waiver of the lien provided by the Constitution. Article 16, § 37, of the Constitution of the State of Texas, provides for a lien upon the buildings and article or material furnished therefor. The evidence having failed to show any fraud, actual or constructive, on the part of appellee, and failing to show any express or even an unintentional waiver, on the part of appellee, of its constitutional lien, the appellee was not estopped from asserting its right to recover.

On the question of waiver, the evidence clearly discloses, in our opinion, that the appellee was ignorant of its constitutional lien at the time it was asserting its rights to a lien under the promise of Pattison to execute a chattel mortgage, and hence could have had no intention to waive its constitutional lien. Moore v. Carey Bros. Oil Co. (Tex. Com. App.) 269 S. W. 75, 272 S. W. 440, 39 A. L. R. 1247; Mutual Oil Consolidated v. Beavers (Tex. Civ. App.) 272 S. W. 507; June & Co. v. Doke, 35 Tex. Civ. App. 240, 80 S. W. 402.

Finding no reversible error, we affirm the judgment of the trial court.